**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| **MONKEYMEDIA, INC.,** | § | |
| *Plaintiff,* | § | |
| | § | |
| | § | |
| | § | |
| **v.** | § | **CASE NO. 1:20-cv-00010-LY** |
| | § | |
| **AMAZON.COM, INC.,** | § | |
| *Defendant.* | § | |
| | § | |

**PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF**

Plaintiff MONKEYmedia, Inc. submits this opening brief on the proper construction of disputed claim terms in U.S. Patent Nos. 6,393,158 ('158), 9,247,226 ('226), 9,185,379 ('379), and 10,051,298 ('298) (collectively, the "patents-in-suit").

## I.      Overview of the Patents

The four patents-in-suit are in the same patent family and teach inventions revolving around a concept referred to as "Seamless Expansion." Seamless Expansion allows a viewer of streaming audiovisual content to access optional content, such as another video, and then resume the main audiovisual content after finishing the optional content. Seamless Expansion thus provides a user with the freedom to explore topics in greater depth based on the user's personal interests.

Plaintiff MONKEYmedia began as a user-interface design firm in the early 1990s with a mission to develop technology that is easier, more intuitive, and more engaging to use. Eric Gould Bear, MONKEYmedia's founder and CEO, and Professor Rachel Strickland conceived the inventions at least as early as 1994 and reduced the inventions to practice shortly thereafter. The

patents-in-suit all expired in April 2019.

The asserted claims in the '158 Patent (Exhibit 1) teach methods for playing segments of audiovisual content, including streaming content in platforms such as Amazon Prime Video, by playing a "main" video segment and determining whether a content expansion, such as those found in the Amazon "X-Ray Feature" is desired. If a content expansion is elected, then an expansion is played rather than the next ("continuing") segment of the main video. After the viewer finishes with the expansion, the main video resumes. If a content expansion is not desired, the continuing segment of the main video plays. The '158 Patent was the subject of a prior reexamination proceeding at the U.S. Patent Office, which issued a certificate of reexamination (Exhibit 1).

The asserted claims in the '226 Patent (Exhibit 2) and '379 Patent (Exhibit 3) are generally directed towards methods and/or computer readable storage media storing instructions capable of causing a device to play a "main" audio and/or video stream of audiovisual content found in platforms such as Amazon Prime Video and determine whether an optional content expansion, such as bonus content in the Amazon "X-Ray Feature" is desired. If the optional content expansion is elected, then the main content stream "pauses," and the content expansion is played. After the viewer finishes with the optional expansion, the main content stream resumes.  The '226 Patent was the subject of a request for *Inter Partes* Review ("IPR") by Unified Patents in 2018. The  Patent Trial and Appeal Board (PTAB) found no reasonable likelihood that Unified Patents would prevail on its assertions of invalidity regarding the '226 Patent claims that are being asserted against Amazon, and denied the request to institute *inter parties* review of those claims.[1]

---

[1]     The PTAB granted review of two independent claims in the '226 Patent. MONKEYmedia agreed to entry of adverse judgment as to those claims to allow MONKEYmedia to quickly go forward on the remaining claims in this patent.

The relevant claims in the '298 Patent (Exhibit 4) focus on devices that are capable of playing a "main" stream of audiovisual content found in platforms such as Amazon Prime Video and determining whether an optional content expansion, such as bonus content in the Amazon "X-Ray Feature" is desired. If the optional content expansion is elected, the main content stream "pauses," and the content expansion is played. After the viewer finishes with the optional expansion, the main content stream resumes.

## II.     Claim Construction Principles

Claim terms "are generally given their ordinary and customary meaning," *i.e.*, "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc). This meaning is determined "by looking first at intrinsic evidence such as surrounding claim language, the specification, the prosecution history, and also at extrinsic evidence, which may include expert testimony and dictionaries." *L.B. Plastics, Inc. v. Amerimax Home Prods., Inc.*, 499 F.3d 1303, 1308 (Fed. Cir. 2007).

The specification in particular is "highly relevant." *Phillips*, 415 F.3d at 1315. "Usually, [the specification] is dispositive; it is the single best guide to the meaning of a disputed term." *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). "Even when guidance is not provided in explicit definitional format, the specification may define claim terms by implication such that the meaning may be found in or ascertained by a reading of the patent documents." *Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1300 (Fed. Cir. 2004).

The prosecution history, which is part of the intrinsic evidence, also plays an important role in claim construction analysis. *Phillips*, 415 F.3d at 1317. "Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent." *Id.* Prosecution

history also has the advantage of having been "created by the patentee in attempting to explain and obtain the patent." *Id.*

Extrinsic evidence—such as dictionaries, learned treatises, and expert and inventor testimony—"can shed useful light on the relevant art," but is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Id.* (quoting *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004)). Courts may consider extrinsic evidence so long as they give due consideration to the limits on its usefulness and to the primacy of the intrinsic record. *Id.* at 1317–19.

## III.   Prior *Markman* Order

In patent infringement suits filed by MONKEYmedia against Apple and other defendants, which were consolidated for the purpose of claim construction, Special Master Karl Bayer conducted several hearings. Among other things, he construed claims of the '158 Patent that included some of the claim terms in dispute in this case. Judge Sparks adopted, in part, Mr. Bayer's recommendations in a *Markman* ruling. *MONKEYmedia, Inc. v. Apple, Inc.*, No. A-10-cv-319, 2015 WL 4758489 (W.D. Tex. Aug. 11, 2015) (Exhibit 5) ("2015 *Markman* Ruling").

The 2015 *Markman* Ruling is entitled to "reasoned deference," but this Court "nonetheless conducts an independent evaluation during claim construction proceedings." *Blue Calypso, Inc. v. Groupon, Inc.*, 93 F. Supp. 3d 575, 583 (E.D. Tex. 2015) (quoting *Maurice Mitchell Innovations, LP v. Intel Corp.*, No. 2:04–CV–450, 2006 WL 1751779, at *4 (E.D. Tex. June 21, 2006)). An independent evaluation is especially important in this case, because the '379, '226 and '298 Patents were not issued until after the 2015 *Markman* Ruling. Thus, while some of the claim terms in these newer patents were the subject of the 2015 *Markman* Ruling, the Special Master and Judge Sparks did not have the benefit of reviewing the prosecution histories regarding these new

patents or have an opportunity to evaluate whether the claims in the newer patents raised new issues about the original construction given to those claim terms.

## IV.     Person of Ordinary Skill in the Art

The level of ordinary skill in the art is a function of many factors, including "(1) the educational level of the inventor; (2) type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology; and (6) educational level of active workers in the field." *Daiichi Sankyo Co. v. Apotex, Inc.*, 501 F.3d 1254, 1256 (Fed. Cir. 2007). Based on these factors, MONKEYmedia proposes that a person of ordinary skill in the art for the patents in suit has either:

> (1) a bachelor's degree in computer science, cognitive science, computer engineering, computer user interface design, multimedia or an equivalent degree, and at least 2 years of experience in the field of computer user interface design or software design and implementation, or

> (2) a post-graduate degree in computer science, cognitive science, computer engineering, computer user interface design, multimedia or an equivalent degree, and at least 1 year of experience in the field of computer user interface design or software design and implementation.

*See* Exhibit 5 at 7.

## V.     Construction of Disputed Claim Terms

Relying on the specification of the patents and accompanying exhibits, MONKEYmedia urges the Court to construe the disputed claim terms as follows:

## 1.     "Segment"

| Claim Term | Amazon's Proposed Construction | MONKEYmedia's Proposed Construction |
|---|---|---|
| "**segment**"<br><br>'158: 37, 40, 41<br>'226: 7, 9 | "sequence of stored content that is fixed and predetermined prior to playing" | No construction necessary.  If construction: "A stream or portion of a stream of multimedia content." |

Generally, a patent's claim terms should be given their ordinary and accustomed meaning. *Johnson Worldwide Assocs. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999) (noting "heavy presumption in favor of the ordinary meaning of claim language."). Terms do not require construction when "their meanings are clear in the context of the claims and will be readily understandable to the jury." *EON Corp. IP Holdings, LLC v. Sensus USA Inc.*, 741 F. Supp. 2d 783, 813 (E.D. Tex. 2010). "[A]lthough every word used in a claim has a meaning, not every word requires a construction." *Orion IP, LLC v. Staples, Inc.*, 406 F. Supp. 2d 717, 738 (E.D. Tex. 2005).

Following these principles, MONKEYmedia contends that "segment" does not require any construction by the Court because it had no special meaning in the field of the invention at the time of the invention, and is readily understandable by the jury in the context of the claims. *See e.g.*, Exhibit 6 (dictionary definition of "segment").  However, if construction of this term is warranted, "segment," as used in the claims at issue in this litigation, generically refers to a stream, or portion of a stream, of multimedia content. *See e.g.*, '226 Patent, C1 L26-31. This comports with the common meaning of this term.

It is important to note that the inventors used "segment" not only to generically refer to a portion of a particular stream but also used "segment" to refer to the *type* of prior art continuous play media at issue, as illustrated by the following statement:

> Taken collectively, there is a certain rationale in considering contemporary continuous play media to be segmented.  The block coding used in both transmission and storage of digital continuous play media reinforces the sense of segmentation of continuous play media into short sequences of motion frames (video stream) and the associated audio stream.

> '226 C7 L13-20.

In other words, the term segment is used in two different contexts in the patents – one referring to segments created by block coding during the authoring process and the other, in a generic sense, as parts of the stream. For example, a movie is segmented continuous play media because it is comprised of a sequence of still images. Because of this block coding, it would be appropriate for a POSITA to refer to a particular sequence of frames within the movie created by this block coding as a segment. It would be equally appropriate for a POSITA to refer generally to any part of the movie (any sequence of frames, regardless of the pre-authored block coding) as a segment. For example, the part of a movie that a viewer watches before leaving the room to get a snack is commonly referred to as a segment of the movie even though this use of segment has nothing to with the pre-authored "segments" of the movie created by block coding. Under both definitions, the frames and the sequence of frames are fixed and predetermined. However, under the more general meaning, a segment could be a sequence of two frames or a sequence of hundred frames, without regard to the underlying block coding of the content.

Regardless of this possible ambiguity, a POSITA would understand from reading the entire specification and reviewing the figures and claims that "segment" as used in the claims generically refers to a stream, or portion of a stream, of continuous play media. The inventions described in the Seamless Expansion Patents contemplate that continuous play media, as a whole, comprises one or more streams of video or streams of text, and may also comprise one or more streams of audio:

> "Continuous play media ("multimedia") can be defined as minimally containing a stream of image or text content forming a perceived continuity when presented to an observer/user.  Continuous play media may further contain content streams forming perceived audio continuities when presented to an observer/user." '226 Patent, C1 L26-31.

An example of a stream of text is the opening of George Lucas' *Star Wars* episodes, where the text of the plot synopsis recedes into the distance as though it were being viewed from a space ship while the opening theme music plays.

A POSITA would also understand that a particular "segment" of continuous play media could be a stream, or portion of a stream, of audio without any accompanying video or image content, as long as at least one other segment somewhere in the presentation includes "a stream of image or text content." This conclusion is supported by the references to presenting an audio stream for display:

> "Relevant prior art speakers 20 communicate with audio generator 32 via arrow 30.  Arrow 30 designates communication mechanisms including but not limited to analog signaling or digital signaling." '226 Patent, C3 L62-65.

> "Note that further preferred embodiments include but are not limited to audio presentation circuitry." '226 Patent, C25 L64-65

The inventors' generic use of "segment" as a portion of a stream when discussing the concept of Seamless Expansion is also illustrated in the paper co-authored by the inventors shortly after the initial patent application in the Seamless Expansion patent family was filed: *Seamless Video Expansion: Shaping the Contour of Streams for Personalized TV.*  Exhibit 9.  As noted in this paper:

> Seamless Expansion employs the syntax of cinematic construction to sustain perceptual continuity among *non-contiguous, overlapping, and parallel segments* of a unified media stream.  (Exhibit 9 at 6, *emphasis added*)

> Yet interaction with the Web might be said to approximate a hop, skip, close-your-eyes-and-jump experience, *with discrete segments of media* bracketed between static pauses, in contrast to the continuously flowing stream of media that Seamless Expansion affords.  (*Id* at 7 *emphasis added*)

Amazon's proposed definition of "segment" improperly limits the scope of the term by focusing solely on a segment created by "block coding" that must be "fixed and predetermined prior to playing." This narrow definition is not supported by one of the central concepts of the invention—that the user's interaction with a running program can establish the beginning and ending of a claimed segment of the content: "What is needed is a method of playing and storing a segmented continuous play media stream which *expands and contracts the viewing material based upon the user/observer's and/or system/agent(s)' selections*." '226 C7 L24-27, (emphasis added).

Figure 7A, for example, illustrates that the length of a segment varies based *on the point in time when* the user elected to expand:

## Figure 7A



'226 C15 L62-CL16 L6: A preceding segment 210 and a succeeding segment 224 are shown by way of example. The discussion will focus on seamless expansion within segment 214. Note that by way of example, the segment 214 is shown as a single contiguous segment within which expansion decision points 216, 218, 220 and 222 occur. In certain preferred embodiments of the invention, each of these decision points is at the ending terminus of the segment it is in and the beginning terminus of the continuing segment."

'226 C16 L26-39: "In certain situations, there may be many expansion links within a relatively short frame sequence. Such situations may be implemented as an additional kind of expansion link, possessing multiple decision points where expansion to other segments may be performed. These decisions may be as frequent as once per frame in certain embodiments. The referenced

> expansion segments may vary for each expansion decision point in certain further preferred embodiments. The first and/or second terminus of these referenced expansion segments may vary linearly with the frame and/or temporal distance from the starting, expansion decision point in certain further preferred embodiments. In certain preferred embodiments, one or both of the termini may grow earlier or later temporally with regards to the continuous play content."

In addition, the Seamless Expansion Patents envision dynamic and flexible capture of live streams:

> "The apparatus has the advantage of being able to capture a live stream and perform content expansions without losing the live content. This apparatus provides the necessary architectural capabilities to archive continuous stream segments locally to build a continuous play media store." ('226 C10 L58-62)

Performing content expansions during the presentation of live content could not occur with "fixed and predetermined" segments. *See also* Response to Office Action dated November 18, 2002 (Exhibit 8 at 8) (distinguishing prior art where expansion "are selected based on *predefined* criteria" by pointing out that Seamless Expansion "allows a user to alter the flow of the content "on the fly," i.e., in real time, *while the media is playing*" (emphasis added).[2]

In the 2015 *Markman* Ruling, the Court defined "segment" as proposed by Amazon. However, in doing so, the Court was only reviewing the claims of the '158 Patent and focused on the fact that each of the claims had the following limitation near the beginning of the claim: "wherein each of said segments has a first terminus and a second terminus." The Court found this limitation meant the first and second termini were already known before the segment is played, and, therefore, the segments taught in those claims must already be known (fixed and predetermined) before playing. *See* Exhibit 5 at 13–16.

---

[2]   This response is from the prosecution history of a patent that is different from, but in the same family as, the patents-in-suit. The application leading to this patent was filed the same day as the application leading to the '158 Patent, which is the parent of the other asserted patents. It shares the same specification and figures as the patents-in-suit. *See* Exhibit **7**.

This limitation is not present in the claims in the '226 Patent and '379 Patent that refer to "segment." Instead, "segment" in these claims is clearly used in the general sense of a part of the stream rather than as a fixed and predetermined sequence of frames with fixed termini that result from block coding. This fact is very clear when reviewing unasserted claims in the '379 Patent that reference segments not having fixed termini created by block coding. *See Accolade Sys. LLC v. Citrix Sys., Inc.*, 634 F. Supp. 2d 738, 742 (E.D. Tex. 2009) ("Other asserted or unasserted claims can also aid in determining the claim's meaning because claim terms are typically used consistently throughout the patent."). For example, Claim 1(f)(ii) of the '379 Patent has the following limitation:

> dynamically determine an expansion decision point established in relation to when the user elected the expansion during display of the first segment [of a main content continuous play media stream] if the expansion is elected, wherein the *expansion decision point is at a second terminus of the first segment and at a first terminus of the second segment* and establishes a beginning point of generating the signal to display the expansion. (emphasis added). ___

Clearly, the termini that bookend the segments referenced in this claim are not known until the expansion decision point is determined by user interaction. In other word, the term "segment" is not referring to a particular segment created by block coding during the authoring process, but is using this term in a generic sense, as parts of a stream of content.

## 2.    "Subset"

| Claim Term | Amazon's Proposed Construction | MONKEYmedia's Proposed Construction |
|---|---|---|
| **"subset"**<br>   '379: 21, 23, 25-26 | "sequence of main content that is fixed and predetermined prior to playing" | Plain and Ordinary Meaning |

The claim term "**subset**" had no special meaning to a POSITA and should be given its plain and ordinary meaning. Amazon's definition of a "subset" as being a "sequence of stored content that is fixed and predetermined prior to playing" is the same proposed construction it uses for "segment." This flies in the face of well-settled law that different claim terms are presumed to have different meanings. *See Bd. of Regents of the Univ. of Tex. Sys. v. BENQ Am. Corp.,* 533 F.3d 1362, 1371 (Fed. Cir. 2008). Moreover, Amazon's construction makes no sense in the context of the claims. For example, claims in the '379 and '226 Patents not only use "subset" when referring to a part of the continuous play media stream (i.e. a subset of the primary continuous play media stream), but also use "subset" when referring to a part of the display space (i.e. "subset of display space").

3.       "**Portion**"

| Claim Term | Amazon's Proposed Construction | MONKEYmedia's Proposed Construction |
|---|---|---|
| "**portion**"<br>'226: 1, 5 | "sequence of primary content that is fixed and predetermined prior to playing" | Plain and Ordinary Meaning |

Like "subset," Amazon wants to disregard the plain and ordinary meaning of "portion" and improperly use the same definition it proposes for both "segment" and "subset." Amazon's proposed construction once again ignores the presumption that different claim terms have different meanings. This presumption is especially strong here as shown in the prosecution history of the '226 Patent. During prosecution, MONKEYmedia was granted a post-allowance amendment, which, in part, allowed changes in some of the claims to clarify the scope of those claims. Among the allowed amendments was the change of the word "segment" in some of the claims to "portion."  Exhibit 10.

Amazon's proposed construction also makes no sense in the context of the claims. For example, Claim 1 of the '379 Patent (among others) uses the term "segment" but uses the claim term "portion" when referring to a part of a segment that is visual (i.e. Claim 1(b) "first visual portion of the first segment"). "Portion" and "segment" cannot not mean the same thing in this claim. "Portion" is a readily understandable term that has no special meaning to a POSITA, and thus should be given its plan and ordinary meaning here.

### 4.    "Link" claim terms

| Claim Term | Amazon's Proposed Construction | MONKEYmedia's Proposed Construction |
|---|---|---|
| "**link**"<br><br>'158: 37, 40, 41<br>'226: 1, 7 | "a predetermined connection from one specified [segment] / [portion] to another specified [segment] / [portion]" | No construction is necessary. If construction is necessary, "a rule or collection of rules that determines the next selection of content" |
| "**linking**"<br><br>'158: 37, 40, 41 | "following the predetermined connection from one specified [segment] / [portion] to another specified [segment] / [portion]" | "Applying link rule(s)" |
| "**expansion link**"<br><br>'158: 37, 40, 41<br>'226: 1, 7 | "a link from a specified segment to a specified expansion [segment] / [portion]" | "A link to expansion content" |
| "**continuity link**"<br>'226: 1, 7 | "a predetermined connection from one specified [segment] / [portion] to another specified [segment] / [portion]" | "A link to a continuing portion of the primary content continuous play media stream" |

The term "**link**" broadly refers to a connection between two sets of data in the field of computer applications. MONKEYmedia contends that "link" (and the other "link" terms) do not require any construction by the Court because "link" had no special meaning in the field of the invention at the time of the invention, and is readily understandable by the jury in the context of

the claims. If construction is necessary, the intrinsic evidence makes clear that "**link**" in the context of the asserted claims means "a rule or collection of rules that determines the next selection of content," and that "**linking**" simply means "applying the link rules." This rule or collection of rules is created during the authoring process.

A "link" may be static such as when it is embedded in a segment of data during the authoring stage and points to a pre-defined portion of content. A link may also be implicit. For example, in a video stream consisting of frames as defined by the MPEG-2 standard, there is an implicit link between successive frames due to the sequential placement of the frames in the stream, and also by the time codes assigned to successive frames. *See e.g.*, '158 Patent C6 L35-C7 L14 (discussing MPEG).

A link may also be implicit when the *ability* to make a connection is available (i.e. the rules prepared during the authoring process allow it), but some action by the user triggers the connection. *See* '158 Patent C12, L47-57 and Fig. 3B. An example is when the time code or other variable tied to where user interaction occurred is stored on a "stack" in memory. Judge Sparks explained this type of implicit link in an order denying summary judgment in the prior litigation referenced above:

> "links" and "expansion links" encapsulates how, in order to return to and play the next continuous play media segment following an expansion, the content player follows the author-defined connections between individual data structures . . . back up through the data structure tree to the original continuous play media segment, 'implicitly deriving' the link between the original segment and next segment of content. Exhibit 14 at 11(Citing Markman Order - *Exhibit 5* at 18).

The problem with Amazon's proposed construction of "link" and other "link" terms is the unnecessary inclusion of the words "predetermined" and "specified" that are confusing and will allow Amazon to argue for improperly narrowing the scope of these terms. The specification of

the asserted patents teaches that an implicit "link" does not need to be "predetermined" nor does it need to connect from or to a "specified segment" (in the way those terms could be used when referring to a static "hyperlink" or other type of static link ). [3]  This is shown by the following language that teaches implicit links involving "non-segments":

> In certain preferred embodiments, the link 118 may be implicitly derived from the remembered state of the content player during the playing of segment 100. In certain further preferred embodiments of the invention, this implicit derivation may be determined by a stack included in the content player and the indication to do this in certain preferred embodiments is a continuity link not indicating a segment.

'226 Patent C12, L54-60. *See also* C17 L43-48 (describing a continuity link that indicates a non-segment; C7 L60-64, C8 L23-25, C8 L67-C9 L2 (same)

Amazon's definition of "link" and "linking" are the same as the 2015 *Markman* Ruling. Exhibit 5 at 16–19. Notably, however, the Special Master heard the testimony during several hearings and did not recommend using "predetermined" as part of the definition. Exhibit 5 at 7. During one of the *Markman* hearings, the Special Master specifically asked the co-inventor Eric Bear whether removing "pre-determined" from the Defendants' proposed construction of "link" was satisfactory. Exhibit 12 at 41:23-45:24. He also questioned the Defendant's expert at length about how the concept of a link always being "pre-determined" could be justified when reviewing the patent's teaching on the link going to a landing offset that could be determined on the fly. Exhibit 13 at 72:21-75:2, 90:17-91:22, 97:19-101:22. The Special Master also made the point that the continuity link return point could be dynamically calculated based on user

---

[3]     This type of implicit link is sometimes referred to as being "dynamic" or resolved "on the fly" because the time when the main content will resume is not established until the user takes some action. However, this type of link is still based on rules that were created as part of the authoring process, and, in that narrow sense, a link is "pre-determined." *See* Exhibit 14 at 11-12 (In denying summary judgment, Judge Sparks discussing alternative embodiment of invention where author can program the content player to store a link on a stack to be retrieved after the expansion content is played.).

interaction, and Defendant's expert agreed with this statement. <u>Exhibit 13</u> at 74:22–75:2. Even though the Defendants did not object to the Special Master's construction, Judge Sparks nevertheless added back the word "pre-determined" *sua sponte*.[4] This addition, as well as the addition of the term "specified," are likely to confuse the jury especially in light of the claims in the newer patents issued after the 2015 *Markman* Hearing.[5]

**5.      "Terminus" claim terms**

| Claim Term | Amazon's proposed Construction | MONKEYmedia's proposed construction |
|---|---|---|
| "**terminus**"<br>    '158: 37, 40, 41<br>    '226: 1, 7 | "a point that is fixed and predetermined prior to playing" | No construction is necessary.<br>If construction is necessary:<br>"A point in time" |
| "**interruption terminus**"<br>    '226: 1, 7 | "a point that is fixed and predetermined prior to playing and at which play can be interrupted" | No construction is necessary.<br>If construction is necessary:<br>"a point in time in the primary content continuous play media stream when playing the primary content is interrupted" |
| "**resume-point terminus**"<br>    '226: 1, 7 | "a point that is fixed and predetermined prior to playing and at which play can be resumed" | No construction is necessary.<br>If construction is necessary:<br>"A point in time in the primary content continuous play media stream when playing the primary |

---

[4]      As noted above, even an implicit link is technically "pre-determined" because <u>the manner</u> in which the link is traversed is established during the authoring process even though user interaction determines <u>when</u> the link is traversed.  MONKEYmedia, however, believes the use of the terms "predetermined" as part of the definition will unnecessarily confuse the jury. Similarly, a link has information about where the user will go if the link is traversed, but rarely has information about where the user came from.  For this reason, MONKEYmedia believes the use of the term "specified" as part of the definition will also unnecessarily confuse the jury.

[5]      If the Court believes construction of "link" is necessary, MONKEYmedia believes it is less confusing to simply use "link" in the terms "expansion link" and "continuity link," rather than re-defining "link" each time. Amazon did not agree with this approach when it was suggested by MONKEYmedia.

| | | content resumes" |
|---|---|---|
| "**resume point**"<br>'379: 21, 22 | "a point that is fixed and predetermined prior to playing and at which play can be resumed" | No construction is necessary.<br>If construction is necessary:<br>"A point in time in the main content continuous play media stream when playing the main content resumes" |

The term **"terminus"** (and other "terminus" terms) do not require any construction by the Court because they had no special meaning in the field of the invention at the time of the invention, and they are readily understandable by the jury in the context of the claims. If construction is necessary, the intrinsic evidence makes clear that "terminus" means "a point in time:"

> "The temporal start of a segment or frame sequence will be denoted as the first terminus and the temporal end of a segment or frame sequence will be denoted as the second terminus hereafter." '226 C12 L45-48

> "In certain preferred embodiments of the invention, each of these decision points is at the ending terminus of the segment it is in and the beginning terminus of the continuing segment." '226 C16 L1-5

This meaning of terminus is supported by the dictionary definition of this term. *See* Exhibit 11.

Amazon's proposed construction that "terminus" is always "a point that is fixed and predetermined prior to playing" is inconsistent with the intrinsic evidence and the claims. While a terminus <u>may be</u> fixed and/or pre-determined prior to playing in some embodiments, it certainly does not need to be fixed or predetermined. This fact is illustrated by the claims themselves. For example, Claim 1 of the '226 Patent (the limitations of which are incorporated

into the asserted dependent claims) expressly states that the "interruption terminus" <u>is established</u> <u>during display</u> of the first portion of the continuous play media stream. By establishing the interruption terminus during playing of the first portion, this terminus necessarily cannot be fixed and pre-determined prior to playing the first portion.

Similarly, unasserted claims in the '379 Patent explicitly reference termini that are not fixed and pre-determined. For example, Claim 1(f)(ii) of the '379 Patent has the following limitation:

> dynamically determine an expansion decision point established in relation to when the user elected the expansion during display of the first segment [of a main content continuous play media stream] if the expansion is elected, wherein the *expansion decision point is at a second terminus of the first segment and at a first terminus of the second segment* and establishes a beginning point of generating the signal to display the expansion. (emphasis added).

The termini referenced in this claim are not known until the expansion decision point is determined by user interaction.

Amazon's definition is also inconsistent with the following language of the specification regarding the manner in which termini "may vary" and "may grow":

> "The referenced expansion segments may vary for each expansion decision point in certain further preferred embodiments. The first and/or second terminus of these referenced expansion segments <u>may vary</u> linearly with the frame and/or temporal distance from the starting, expansion decision point in certain further preferred embodiments. In certain preferred embodiments, one or both of the termini <u>may grow</u> earlier or later temporally with regards to the continuous play content." ('226 Patent, C16 L28-36 emphasis added).

Furthermore, Amazon's definition conflicts with evidence regarding the resume point/ resume point terminus.[6] The dynamic determination of the resume point as the landing offset was

---

[6]      It is clear that "terminus" is simply redundant of "point."

the subject of testimony at the Markman Hearing in the Apple Litigation. While the parties disagreed about whether a segment was pre-determined, Defendants' expert in that case agreed with the Magistrate that the continuity link's return to a landing offset (i.e. the resume point) could be "dynamic" or "on the fly." *See* <u>Exhibit 13</u> at 74:22–75:1. Moreover, the fact that the resume point terminus can be dynamically determined (rather than being pre-determined) is expressly taught in claims that are not asserted in this proceeding. *See Accolade Sys. LLC*, 634 F. Supp. 2d at 742 (unasserted claims can aid in determining the asserted claim's meaning). For example, Claim 1(e)(iii) of the '379 Patent expressly teaches the following:

> iii. *dynamically determine a resume point* as a landing offset …" ('379 C27 L 62-65).

This Court should therefore either not construe "terminus," or alternatively construe it to mean "a point in time."

**6.    "Expansion decision point"**

| Claim Term | Amazon's proposed Construction | MONKEYmedia's proposed construction |
|---|---|---|
| "**expansion decision point**"  '226: 1, 7 | "a point that is fixed and predetermined prior to playing and at which expansion can occur" | No construction is necessary.  If construction is necessary:  "A point in time in the primary content continuous play media stream when the user decision to access optional content is detected by the device" |

The term **"expansion decision point"** does not require any construction by the Court because it had no special meaning in the field of the invention at the time of the invention, and it is readily understandable by the jury in the context of the claims. If construction is necessary, MONKEYmedia proposes the following definition: "A point in time in the primary content

continuous play media stream when the user decision to access optional content is detected by the device." This meaning is clear from the claims teaching that the interruption point terminus and resume point terminus are both established "during display of the first portion at an expansion decision point if a content expansion is selected by a user." *See* Claim 1 of '226 Patent.[7] In other words, the decision point is tied to the user selection of the content expansion.

Amazon's proposed construction that the "expansion decision point" must be "fixed and predetermined prior to playing" ignores the key importance of *user interaction* in accessing optional content. Amazon's construction is also inconsistent with the language of other claims in the Seamless Expansion Patents. For example, Claim 1(e)(ii) of the '379 Patent (not asserted in this litigation) expressly teaches the following:

> ii. *dynamically determine an expansion decision poin*t established *in relation to when the user elected* the expansion during display of the first segment if the expansion is elected ('379 C27 L 54-56) (emphasis added)

An "expansion decision point" "dynamically" determined in relation to "user election" cannot be "fixed and predetermined prior to playing," as Amazon proposes. *See Accolade Sys. LLC*, 634 F. Supp. 2d at 742.

The specification also makes clear that the decision point is tied to the user selection of the content expansion:

---

[7]    Claim 1 is not being asserted, but the limitations of Claim 1 are incorporated into the claims that depend from Claim 1.



Figure 6

If operation 186 determines that additional expansion content should be played, arrow 200 directs execution to operation 202 ('226 Patent C15 L48-50)



Figure 10

Arrow 516 directs execution to start operation 518, which determines whether an expansion cue has been selected.  ('226 Patent C21 L24-35)

7.      "Landing offset"

| Claim Term | Amazon's proposed Construction | MONKEYmedia's proposed construction |
|---|---|---|
| "**landing offset**" <br> '379: 21 | "point temporally located after the beginning of the second subset" | No construction is necessary. <br> If construction is necessary: <br> "Temporal displacement" |

The term **"landing offset"** does not require any construction by the Court because it had no special meaning in the field of the invention at the time of the invention, and is readily understandable by the jury in the context of the claims. If construction is necessary, MONKEYmedia proposes the following definition: "Temporal displacement." This definition comports with the commonly understood meaning. *See e.g.*, Exhibit 15 (Definition of "offset" from Merriam-Webster Dictionary "3b: displacement"; Definition of "displacement" from Merriam-Webster Dictionary "b: the difference between the initial position of something (such as a body or geometric figure) and any later position.")

The specification of the '379 patent shows that the purpose of the landing offset is to provide a level of flexibility regarding when the main content stream resumes playing after returning from playing the expansion. The landing offset allows the main content to resume shortly before, at, or shortly after the expansion decision point — the point in time in the main content when the user decision to access optional content is detected by the device. This flexibility allows the main stream to resume where it left off or, alternatively, would allow a small portion of the main stream to either be repeated or skipped if necessary — thereby making the viewer experience of transitioning back to the main stream from expansion content more seamless. If, for example, the interruption in the main stream took place in the middle of a

sentence, then resuming a little earlier or a little later through a "landing offset" would create a better user experience.

A "landing offset" in one embodiment of the invention is illustrated by the following excerpts from the '379 Patent:

## Figure 8A



C17L9-20: FIG. 8A depicts segment expansion utilizing a landing sub-segment in accordance with an embodiment of the invention. Segment 260 possesses expansion link 266 to the first terminus of segment 268. The continuity link from segment 262 goes to the first terminus 264 of segment 274. The continuation link after segment 268 goes not to segment 274's first terminus 264, but to landing offset 272 temporally located after first terminus 264. Several methods in accordance with various preferred embodiments of the invention supporting such situations will be discussed later in this document.

Although the figure illustrates the landing offset as being after the beginning of the second segment in this particular embodiment, nothing in the patent requires that the landing offset *always* be in a second segment. Rather, the resume point as a landing offset could be the beginning of the second subset (if the offset was zero seconds). *See e.g.*, Claim 19 of the '379 Patent (resume point is a landing offset at same location as decision point). MONKEYmedia's definition—which does not limit the landing offset to only a point after the beginning of the second subset—is thus the more accurate construction of this term.

The Court in prior claim construction of the '158 Patent defined the term "continuity link offset" to be "a point temporally located after the first terminus of the continuing segment." Exhibit 5 at 8. Amazon proposes that this same definition be applied to "landing offset" here, even though well-settled law holds that different claim terms are presumed to have different meanings. A "continuity link" would necessarily go to the continuing or second subset of the main content. A landing offset, however, is a broader term and does not have this restriction.

Moreover, Amazon's proposed construction of "landing offset" runs afoul of the claim differentiation doctrine. *See e.g. Am. Med. Sys., Inc. v. Biolitec, Inc.*, 618 F.3d 1354, 1360 (Fed. Cir. 2010) ("Under the doctrine of claim differentiation, []dependent claims give rise to a presumption that the broader independent claims are not confined to that range." (citation omitted)). In the present case, Claim 21 of the '379 Patent teaches establishing a resume point (where the main content resumes playing after playing the expansion) as a landing offset less than ten seconds from where user input electing an expansion was detected (the decision point). Claim 22, which depends from Claim 21, expressly limits the temporal location of the resume point as a landing offset to a value of greater than zero seconds, thereby making it clear that the landing offset in Claim 21 can be zero seconds (where the resume point is the same location as the decision point) or even less than zero seconds (where the resume point is before the decision point – essentially repeating content). *See also* Claim 18 of the '379 Patent (resume point is a landing offset before the decision point); Claim 19 of the '379 Patent (resume point is a landing offset at same location as decision point).

8.      **"Transition"**

| Claim Term | Amazon's proposed Construction | MONKEYmedia's proposed construction |
|---|---|---|
| "**transition** | "audio or visual content or effect that is presented while passing from one portion of a presentation to another portion of the presentation" | No construction is necessary.<br><br>If construction is necessary:<br><br>"Audio and/or visual content and/or effect while passing from one set of content to another." |

The term **"transition"** does not require any construction by the Court because it had no special meaning in the field of the invention at the time of the invention, and is readily understandable by the jury in the context of the claims. If construction is necessary, the intrinsic evidence makes clear that "transition" means "Audio and/or visual content and/or effect while passing from one set of content to another."

Amazon's proposed construction of "transition" is very similar, but includes the terms "presented" and "presentation." While Amazon's proposed construction of "transition" tracks the construction given in the 2015 *Markman* Ruling, this definition was initially formulated in the context of claims in a different patent that explicitly focused on a "presentation." *See e.g.*, Exhibit 17. Claim 123 of Patent No. 7,890,648 ('648 Patent) ("The *presentation* of claim 106 further capable of allowing the audio and/or video player to generate a signal to display a transition from the first segment to the expansion and/or from the expansion to the continuing segment." (emphasis added)). The terms "presentation" together with "transition" also appear in claims of the '379 Patent that are not asserted in this litigation. *See e.g.*, Claim 8 (referring to "presentation method" and "transition"). But none of the asserted claims use the term "presentation," and thus it would be confusing to the jury to include "presentation" in the

definition of "transition"for the construction of the claims at issue.

## VI.    The Claims Are Not Indefinite

Without proposing any claim construction, Amazon contends that several claims are indefinite. As a threshold matter, these invalidity contentions are better left to a motion for summary judgment or trial, rather than the claim-construction stage. *See Int'l Development LLC v. Richmond*, 2010 WL 4703779, at *6 -*7 (D.N.J. Nov. 12, 2010) ("[W]hile indefiniteness has the same construction underpinnings as a *Markman* hearing, two reasons make it more appropriate to defer it until summary judgment: (1) the high burden of proof required to show indefiniteness and (2) its potentially dispositive, patent-invalidating nature."); *Intergraph Hardware Techs. Co. v. Toshiba Corp.*, 508 F. Supp. 2d 752, 773 n.3 (N.D. Cal. 2007) ("[The] indefiniteness argument is inappropriate at the claim construction stage."); *Pharmastem Therapeutics, Inc. v. Viacell Inc.*, 2003 WL 124149, at *2 n.1 (D. Del. Jan. 13, 2003) ("[T]he court will not address the defendants' indefiniteness argument at [the Markman stage] . . . . [I]t is clear that the court must first attempt to determine what a claim means before it can determine whether the claim is invalid for indefiniteness."); *ASM America, Inc. v. Genus, Inc.*, 2002 WL 1892200, at *16 (N.D. Cal. Aug. 15, 2002) (The Defendant "has not even filed a motion seeking to invalidate any of the claims of the '590 patent on the basis of indefiniteness, but simply asserts its arguments in its opposition claim construction brief. This is not a preferable procedure.").

Alternatively, the disputed claims are not indefinite. A court will not find a patented claim indefinite unless the claim interpreted in light of the specification and the prosecution history fails to "inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014). A decision on whether a claim is indefinite requires a determination of whether those skilled in the art would

understand what is claimed when the claim is read in light of the specification. *Power-One, Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1350 (Fed. Cir. 2010).

| Claim Term | Amazon's proposed Construction | MONKEYmedia's proposed construction |
|---|---|---|
| "**spatiotemporal continuity**" <br> '226: 7 <br> '379: 21 <br> '298: 1, 13 <br> "**spatiotemporally continuous**" <br> '226: 1 | Indefinite | No construction is necessary. <br> If construction is necessary, <br> "In temporal succession and in substantially the same display space." |

"Spatiotemporal continuity" (also called cinematic continuity) simply means continuity in time and space. *See e.g.*, <u>Exhibit 18</u> (definition of "Spatiotemporal" from Merriam-Webster Dictionary "**1:** having both <u>spatial</u> and <u>temporal</u> qualities."). While the term "spatiotemporal continuity" is not expressly used in the specifications of the patents, the concept of continuity in space and time is fundamental to the claimed invention and clearly contemplated by the invention. *See e.g.*, '379 C1 L39-41 ("Programs may generate these image streams, where the displayed view is altered in a manner rendered essentially continuous"); '379 C1 L50-53 ("Such image content streams may be further accompanied by acoustic effects which augment, and in some cases, establish the sense of continuity experienced by the user/observer."); C12 L25-33 (going from one set of content to another occurs "after at most a small amount of time"); *see also* Fig. 6 (depicting playing content having a temporal flow without appreciable delay); Fig. 4C (showing the expansion content being presented in substantially the same display space (140) that was occupied by the main content.)

Other intrinsic evidence expressly addresses "spatiotemporal continuity." The inventors

expressly discussed the concept of "spatiotemporal continuity" (aka cinematic continuity) in distinguishing prior art references during the prosecution history of several patents in the Seamless Expansion Patent family. For example, during the reexamination of the '158 Patent, co-inventor Eric Bear submitted a declaration, explaining the concepts of spatiotemporal continuity:

> One of the unique and fundamental aspects of the claimed Seamless Expansion invention is temporal continuity, which is intricately intertwined with how the portions of content spatially relate to each other. Prof. Strickland refers to this spatiotemporal sequencing of content in her declaration as cinematic continuity. The experienced presentation flows from a first experienced segment to an optional portion of content to a continuing segment through a combination of (a) inserting the optional content into the flow of the main content, (b) maintaining temporal continuity between each of the segments of the presentation and (c) avoiding breaking the bounds of the main content's visual display area for presentation of optional expansion content.

Exhibit 19 at 2.

Similarly, Rachel Strickland, the other co-inventor, submitted a declaration during the reexamination of the '158 Patent explaining cinematic continuity (aka spatiotemporal continuity):

> "there is a linear sequencing of content that plays with little, if any, delay in generally the same defined space. Playing in the "same space" on a computer, for example, would be having the main content stream playing in a window and, if an expansion was selected, replacing the main content with the expansion content in the same window, rather than playing the expansion content in a separate window."

Exhibit 20 at 7.

| Claim Term | Amazon's proposed Construction | MONKEYmedia's proposed construction |
|---|---|---|
| **"substantially fills"**<br>'379: 21 | Indefinite | Plain and Ordinary Meaning |

The phrase "**substantially fills**" does not require any construction by the Court because it has a plain and ordinary meaning and is readily understandable by the jury in the context of the claims and specification. *See e.g.*, '379 Patent C5 L20-25, C8 35-36, C17 L34-41 (using plain and ordinary meaning of "substantially"); *see also* <u>Exhibit 16</u> (definition of "substantially").

The fact that this claim uses a term of degree — "substantially" — does not render the claim indefinite as Amazon asserts: "Claim language employing terms of degree has long been found definite where it provided enough certainty to one of skill in the art when read in the context of the invention." *Interval Licensing LLC v. AOL, Inc*., 766 F.3d 1364, 1370 (Fed. Cir. 2014). "The fact that the claim language adds the term 'substantially' does not render the claim ambiguous or *per se* indefinite. Courts have consistently construed claims that recite 'substantially' as understood terms of degree." *Tinnus Enterprises, LLC v. Telebrands Corp.*, No. 6:15-cv-00551, 2016 WL 3476028, at *5 (E.D. Tex. Apr. 28, 2016), report and recommendation adopted, 2016 WL 3475320 (E.D. Tex. June 7, 2016) (citations omitted).

Here, in Figure 4C, the illustration of expansion content leaving a "minimal or non-existent background" demonstrates that the term "substantially fills" in the claims carries its plain and ordinary meaning:

## Figure 4C



140   142

FIG. 4C shows the user view of the start of the continuous play expansion content in accordance with an embodiment of the invention. The expansion content is presented in region 140 of the display, *with a minimal or non-existent background* 142. In certain preferred embodiments of the invention, the minimal background 142 is used for presenting limited content messages. In certain further preferred embodiments of the invention, the minimal background 142 is further used to present advertising or announcements such as broadcast television storm warnings.

'379 Patent C13 L22-31 (emphasis added)

| Claim Term | Amazon's proposed Construction | MONKEYmedia's proposed construction |
|---|---|---|
| **"after at most a small amount of time"**<br><br>'226: 1, 7 | Indefinite | Plain and Ordinary Meaning |

Again, this term of degree does not render the claim indefinite. Given the state of the art at the time of the invention, a person of ordinary skill would understand that existing broadcast systems at the time would experience delay in switching from one content to another:

'226 Patent C6 L59 - C7 L5: Consider what happens when someone changes television channels. The MPEG stream of the new channel is isolated and demodulated from the television broadband transmission into a video stream and an audio stream. The video stream is scanned until the next initializing video frame is encountered. Once encountered, the MPEG video decoder initializes its output stream and motion video frames follow shortly from this initialization frame. These initialization frames occur frequently enough that there is a barely noticeable delay between when one turns to a new channel and the channel's video stream is being displayed. If at this point, the channel is again changed, a short time later there is another initialization video frame observed, the motion frame sequencing begins again.

The specification recognizes this feature by explaining that going from one set of content to another may occur "after at most a small amount of time":

Component 108 indicates that continuous play media segment 100 is played. Component 110 indicates that segment 102 is not played, and that after at most a small amount of time, component 112 indicates that continuous play media

segment 104 is played.  '226 C12 L30-33.

In addition, the prosecution history of the '226 Patent makes clear that "small amount of time" is not indefinite. During the prosecution of this patent, MONKEYmedia submitted an Information Disclosure Statement ("IDS") that included transcripts of the Markman Hearing held in the Apple Litigation on July 28-29, 2011. An excerpt from this IDS is attached as <u>Exhibit 21</u>. As shown by this excerpt, these transcripts were considered by the Examiner before allowing the claims in the '226 Patent and are considered part of the intrinsic record.

During the Markman hearing, Eric Gould Bear (one of the inventors and an expert in the field of the invention) was specifically asked by the Special Master how a person of ordinary skill in the art would know how much a "small amount of time" is. <u>Exhibit</u> 22 at 154: 1-5. After replying that it is at most a "few seconds" and elaborating as to the reasoning for his opinion, Mr. Bear testified that less than ten seconds would have been the tolerance for delay among experts in the user experience field at the time of the invention. <u>Exhibit 22</u> at 156:1-157:10. This evidence shows that the phrase "after at most a small amount of time" provides "enough certainty to one of skill in the art when read in the context of the invention," and is thus not indefinite. *Interval Licensing LLC*, 766 F.3d at 1370.

| Claim Term | Amazon's proposed Construction | MONKEYmedia's proposed construction |
|---|---|---|
| "**providing a highlighted expansion cue to a user that is integrated with the display ... whereby the display of the expansion cue is distinct from the display of the at least one segment**" '226: 7 | Indefinite | No construction necessary. If construction, see proposed construction of "highlighted" and "cue". Plain and Ordinary Meaning as to remaining language. |

A POSITA would readily understand that having a cue "integrated with the display," as illustrated in Figures 4A and 4B and 5D of the specification, means the cue shows within the same display space as the continuous play media. A POSITA would also readily understand that an expansion cue "distinct from the display" is a cue structured as an overlay, popup or effect applied to the continuous play media stream, rather than being an object in the continuous play media stream itself (such as one of the characters in the story). Nothing about these terms renders this claim indefinite or requires claim construction beyond the previously agreed definitions of "highlighted" and "cue."

## VII.   Prayer

For the foregoing reasons, Plaintiff MONKEYmedia prays that this Court adopt Plaintiff's proposed construction of the disputed claim terms and for such other and further relief, whether at law or in equity, to which it may show itself to be justly entitled.

Respectfully submitted,

GRAVES, DOUGHERTY, HEARON & MOODY, P.C.
401 Congress Avenue, Suite 2700
Austin, Texas 78701
(512) 480-5600 Telephone
(512) 480-5853 Telecopier


By:   _____*/s/ Steven D. Smit*_____
Steven D. Smit
State Bar ID No. 18527500
ssmit@gdhm.com
Matthew C. Powers
State Bar ID No. 24046650
mpowers@gdhm.com

ATTORNEYS FOR PLAINTIFF MONKEYMEDIA, INC.

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of October, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to counsel of record for Defendant as follows:

Barry K. Shelton
SHELTON COBURN LLP
311 RR 620 S., Suite 205
Austin, Texas 78734
bshelton@sheltoncoburn.com

J. David Hadden
Email: dhadden@fenwick.com
Saina S. Shamilov
Email: sshamilov@fenwick.com
Ravi R. Ranganath
Email: rranganath@fenwick.com
Johnson Kuncheria
Email: jkuncheria@fenwick.com
Dargaye Churnet
Email: dchurnet@fenwick.com
FENWICK & WEST, LLP
Silicon Valley Center
801 California Street
Mountain View, CA  94041

Todd R. Gregorian
Email: tgregorian@fenwick.com
Min Wu
Email: min.wu@fenwick.com
FENWICK & WEST, LLP
555 California Street
San Francisco, CA 94104

Scott D. Baker
Email: sbaker@fenwick.com
FENWICK & WEST, LLP
902 Broadway, Suite 14
New York, New York 10010

/s/ Steven D. Smit
Steven D. Smit

3645022.v1